### KNOPER *v.* BURTON.

1. EVIDENCE—PHYSICIAN-PATIENT PRIVILEGE—TESTIMONY OF NON-TREATING DOCTORS.

> Plaintiff in an automobile injury action who invokes the physician-patient privilege may introduce the testimony of non-treating doctors based on hypothetical questions, but in framing the hypothetical questions plaintiff's counsel may not use X-rays taken by another doctor for purposes of treatment because they are within the privilege.

2. SAME—PHYSICIAN-PATIENT PRIVILEGE—TESTIMONY OF NON-TREATING DOCTORS.

> A non-treating doctor who is testifying on the basis of hypothetical questions may base his opinion on X-rays which he has caused to be taken solely for the purpose of rendering an opinion.

3. TRIAL—PROCEDURE—REOPENING OF PROOFS BY PLAINTIFF—DISCRETION OF COURT.

> Reopening of proofs upon plaintiff's motion is a matter within the sound discretion of the trial court, and an appellate court will not interfere unless there is a showing of abuse of discretion.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5] 58 Am Jur, Witnesses §§ 411, 416.
[3, 4] 53 Am Jur, Trial § 123 *et seq.*

4. SAME—PROCEDURE—REOPENING OF PROOFS BY PLAINTIFF—DISCRE-
TION OF COURT.

Refusal by trial court to allow plaintiff to reopen his proofs when
the only harmful effect on defendant would have been to con-
tinue the trial at most to the next day, the new testimony would
be based on exhibits already in evidence, and the evidence
concerned a necessary element of plaintiff's case *held*, an
abuse of discretion; to allow a reopening would work no sur-
prise or hardship on defendant and to refuse a reopening would
practically destroy plaintiff's case.

5. EVIDENCE—TESTIMONY OF NON-TREATING DOCTOR.

Striking by trial court of the testimony based on hypothetical
questions asked of a non-treating doctor because he stated that
he could not diagnose a certain condition with reasonable
medical certainty without examining patient *held*, error; rea-
sonable medical certainty is not required, it being up to the jury
to determine the issue where conflicting inferences could be
drawn.

Appeal from Kent, Vander Wal (John H.), J.
Submitted Division 3 February 7, 1968, at Grand
Rapids. (Docket No. 3,493.) Decided August 26,
1968. Leave to appeal granted November 25, 1968.
See 381 Mich 790.

Complaint by Ruth Knoper against William Sneed
Burton for injuries received in an automobile acci-
dent. Verdict and judgment for defendant. Plain-
tiff appeals. Reversed and remanded for new trial.

*Marcus, McCroskey, Libner, Reamon, William &
Dilley (J. Walter Brock, of counsel), for plaintiff.*

*Hillman, Baxter & Hammond (Kenneth R. Ooster-
house, of counsel), for defendant.*

PER CURIAM. Ruth Knoper sued William Sneed
Burton for certain personal injuries and loss of
wages incurred as a result of being struck by de-

fendant's automobile. A jury returned a verdict of no cause of action and judgment was entered upon the verdict. Plaintiff appeals.

Plaintiff was crossing 36th Street in Wyoming, Michigan, at about 8:15 p.m. on December 22, 1961. She was accompanied by 2 coemployees of the Fisher Body plant; all 3 were returning to the plant after a break in the work. They had crossed the first 2 lanes of traffic and were standing in a row (the plaintiff in the middle) at or near the center line when all of them were struck by defendant's car. The victims were standing in a marked pedestrian crosswalk and were observing the traffic coming from the opposite direction when the accident occurred.

Plaintiff's injuries consisted of a number of superficial abrasions, and some damage to the lower back and left hip area, as well as an injury to her neck and the right side of her head; there was also some damage to the right eye. Extensive treatment was required, and it also appeared at trial that some future treatment would be necessary, plaintiff having been attended by several physicians. Since plaintiff elected to stand upon the physician-patient privilege,[1] the treating doctors were barred from testifying in the case. She sought to support her claim instead upon the expert witness testimony of 2 non-treating doctors, neither of whom had even examined plaintiff. These witnesses were questioned by means of hypotheticals; their testimony in response to such questions was excluded by the court, and therein lies the first allegation of error.

Doctor Harold Schaubel, an orthopedic specialist, who neither treated nor examined the plaintiff, was called by plaintiff and asked a hypothetical question. On direct examination he was asked:

---

[1] CLS 1961, § 600.2157 (Stat Ann 1962 Rev § 27A.2157).

"*Q.* Doctor, do you have an opinion as to the probable relationship of this condition which you have described, to the trauma or injury that I described she received from the impact from the automobile?

"*A.* Yes.

"*Q.* What is your opinion?

"*A.* I believe, as I understand the problem, the injury was the cause of the distortion I see in the film, and this distortion is usually seen and accompanied with pain."

He relied in part upon X-rays taken at the request of a treating physician, Doctor Andre. The trial judge properly ruled that the X-rays were necessary diagnostic tools to enable Doctor Andre to prescribe for plaintiff-patient and therefore within the privilege. The hypothetical question relied in part upon the X-rays taken at the request of the treating physician and was objectionable.

In addition, Doctor Schaubel had viewed X-rays which he had caused to be taken and his opinion in response to the hypothetical question was based in part upon such X-rays. Plaintiff's counsel, after resting and before defense counsel had entered upon his proofs, asked to recall Doctor Schaubel and examine him on the basis of the unprivileged X-rays already received in evidence. The continuance was denied plaintiff's counsel and the whole of Doctor Schaubel's testimony was stricken.

A granting of the opportunity to recall Doctor Schaubel at most would have meant the continuance of the trial to the next day. As a result of the denial, plaintiff did not have the advantage of going to the jury with any of the testimony of Doctor Schaubel. His testimony insofar as it would have been based upon a proper hypothetical question and upon the X-rays he himself had caused to be taken, would have been admissible.

We are guided by the general rule, as stated in
*People, for use and benefit of E. P. Brady & Co.,* v.
*Gilliland* (1958), 354 Mich 247, p 253:

"A reopening of the proofs upon plaintiff's mo-
tion is a matter within the sound discretion of the
trial court, with which discretion we will not inter-
fere, absent a showing of abuse thereof."

On issues of reopening proofs, this Court's attitude
has generally been one of noninterference. See
*Cataldo* v. *Winshall* (1966), 2 Mich App 442; *Rucker*
v. *Wyandotte Savings Bank* (1967), 6 Mich App 195.
However, this Court did find error in a trial court's
decision to reopen proofs where there was no mo-
tion to reopen. *Benfield* v. *H. K. Porter Company,*
*Inc.* (1965), 1 Mich App 543.

Judicial review is not foreclosed, however, by the
mere utterance of the word "discretion". Our Su-
preme Court, in *Bonner* v. *Ames* (1959), 356 Mich
537, ruled that a trial judge was in error in denying
a motion to reopen proofs made at the close of plain-
tiff's case during arguments on defendant's motion
for a directed verdict. The Court commented, p 541:

"We recognize, of course, and have often held,
that a motion to reopen proofs is a matter within
the discretion of the court. But the discretion must
be a sound judicial discretion. Here the case had
not proceeded to such a point, nor had conditions
so changed, that any undue advantage would be
taken by plaintiff."

Quite recently this Court also reversed a trial
court's denial of a motion to reopen proofs. *Seri-*
*janian* v. *Associated Material & Supply Co.* (1967),
7 Mich App 275. The basis of the ruling in that
case is contained in the following excerpt from p
280:

"Defendants Zylstra or Associated would not have been prejudiced by reopening proofs  *  *  *. There is no showing of undue hardship, surprise, or that they would be unable to meet the forthcoming testimony."

The record reflects only one particular in which defendant would be prejudiced by reopening plaintiff's proofs: the case would have to be continued until later the same day, once again to accommodate Dr. Schaubel's schedule. The doctor was not a new witness in the trial and his new testimony would be based on exhibits already received in evidence. By means of the testimony of this doctor, plaintiff sought to submit evidence of the causal relationship between the accident and the injuries, a necessary element in her case. Under these facts we find no surprise or undue hardship to defendant, were the reopening permitted. On the other hand, the disallowance of reopening, coupled with the striking of Dr. Schaubel's earlier testimony, practically cut the heart out of plaintiff's case. It was error to refuse plaintiff permission to reopen.

Dr. Robert A. Dye, an ophthalmologist called by plaintiff, was neither a treating nor an examining physician, but he too was examined through the statement of a hypothetical question. On direct examination Dr. Dye testified:

"*Q.* Doctor, do you have an opinion to a reasonable medical certainty of the probable cause of the condition which I have described to you?

"*A.* Yes.

"*Q.* Would you give us your opinion, Doctor?

"*A.* Well, the most likely thing to be aggravated by hydrocortisone would be herpetic keratitis.

"*Q.* Herpetic keratitis, would you, can you explain to us in terms with intelligence to the layman, what herpetic keratitis is?

"*A.* Herpetic keratitis can be defined as a virus disease involving the cornea or front of the eye, in such a way as to produce a lesion through which then produces other involvement of inflammation and symptoms.

\* \* \*

"*Q.* All right Doctor, do you have an opinion with reasonable medical certainty of the probable cause of herpetic keratitis in this case?

"*A.* Yes.

"*Q.* Would you give us your opinion?

"*A.* It would be my opinion that this was as a direct or indirect result of the trauma that she suffered."

On cross-examination Dr. Dye testified:

"*Q.* Did he indicate to you that he wanted you to testify here without ever having examined this patient or this person?

"*A.* Yes.

"*Q.* He did, all right, now you have testified I take it to reasonable medical certainty, can you testify with reasonable medical certainty as to what the condition of Mrs. Knoper's eyes have been in?

"*A.* No I can't.

"*Q.* You would want to examine her first?

"*A.* Yes.

"*Q.* Then you could tell?

"*A.* Yes."

At the close of plaintiff's proofs, on a motion made by defense counsel, the whole of Dr. Dye's testimony was stricken since he had not testified that the particular disease was caused by the trauma and since he could not diagnose the condition with any reasonable medical certainty without an examination of the plaintiff.

For the testimony of Dr. Dye to be admissible he need not have testified in terms of reasonable medical certainty. 11 Michigan Law & Practice, § 255, pp 473, 474, recites:

"Medical testimony may be accepted on the issue of the probable effect of injuries, their permanence, the possibility of complications, and the probability of the injured party's recovering the ability to work * * * a physician may testify that the injury involved is attributable to, or could be caused by, the accident complained of, or that a described fall would be sufficient to cause a certain injury, and testimony that there was a very great possibility that an injury could have been caused by the accident alleged has been admitted, despite its lack of probative value. It is also competent for a doctor to testify that there 'may have been' a diseased condition secondary to a fracture."

In *Schreiner* v. *American Casualty Company* (1965), 1 Mich App 43, 47, it was concluded that there was sufficient evidence both for the case to go to the jury and to support its verdict for plaintiff, when one of the experts "conceded that there was a possibility that the carotid sinus reflex could have been a cause of death."[2]

Another medical expert had testified that the cause of death was a blow on the head causing a concussion and subsequent unconsciousness. It was testified that with the neck crimped over to the side, the hyperactive carotid sinus reflex was activated and death followed.

Here, as there, it was for the jury to determine the issues where conflicting inferences could be drawn from the evidence.

New trial ordered. Costs to appellants.

FITZGERALD, P. J., and J. H. GILLIS and BOWLES, JJ., concurred.

---

[2] Compare *Bilicki* v. *W. T. Grant Co.* (1968), 10 Mich App 612, where the witness stated that he could not with reasonable degree of medical certainty form opinion as to malady suffered by plaintiffs, his testimony being held insufficient to make a submissible case.